**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

D.D.S. CAMERON HULSE,

        Plaintiff,

vs.                                           Case No. 3:05-cv-594-J-32TEM

ORTHODONTIC EDUCATION, LTD,

        Defendant.

## **ORDER**

Plaintiff, orthodontist Cameron Hulse (Hulse), and Defendant, Orthodontic Education, LTD (OEC), entered into an agreement whereby OEC was to pay for Hulse's orthodontic education; in exchange, Hulse would practice under the auspices of OEC, which would profit from the arrangement. The parties had a falling out, leading to this lawsuit.

This case dates from 2005 and was litigated with appropriate vigor by both parties until 2007 when, due to medical problems, Hulse was unable to participate and the case was administratively closed. (Docs. 65, 73). The Court reopened the case in July 2010 and it is now before the Court on cross-motions for summary judgment and partial summary judgment. (Docs. 86, 87, 92). By briefing and at a status conference on June 28, 2010 and oral argument on October 20, 2010, the transcripts of which are incorporated by reference, the parties have requested that the Court direct its consideration to certain contract issues, representing that resolution of these issues would aid them in resolving the case. (Docs. 95, 96). Thus, the only issues currently before the Court are questions of contract interpretation.

The contracts at issue are contained in the exhibits to the depositions of Hulse and OEC's Vice President of Business Development, Ernest Bono. (Docs. 49, 50).

**I.     Facts**

When Hulse first came in contact with Bono in 2002, OEC was in the early stages of launching a business. The business model of OEC was essentially as follows: Because of the high average age of orthodontists and the ever increasing demand for orthodontic services, there was likely to soon be a considerable need for new orthodontist offices. (Doc. 49, Ex. 1 at 1-4). By standardizing care and unifying management for many practices, greater economies could be realized than in a normal solo practice. Id. at 4-6. OEC designed a program to get dental school graduates into a select group of orthodontistry schools, provide them with a full scholarship and stipend, set up an office for them in the locality of their choice following graduation, and provide business management for the resultant practices. (Doc. 87 at 3). These orthodontists were to benefit by receiving a free orthodontic education and a $35,000 stipend for each of their two years at school, and being set up in a practice without needing to invest any capital of their own. Id. at 4; (Doc. 50, Ex. 32). The benefit to OEC was that each orthodontist was required to work for the OEC managed practice for a minimum of seven (7) years, during which time OEC would profit through management fees and profit sharing. (Doc. 87 at 3, 13). In short, the up-front cost to OEC was very considerable and the profitability of the venture rested on the ability of OEC to retain orthodontists post-graduation and receive substantial revenues from the practices OEC set up.

When Hulse met Bono in 2002 and Bono described OEC's proposition, Hulse was interested. (Doc. 50, Ex. 2). He and OEC ultimately executed an "Orthodontist Graduate Program and Placement Agreement" (Graduate Agreement) in February 2003. (Doc. 50, Ex. 5, 7). The Graduate Agreement fully deals with the education-related requirements for both parties. It sets out both the obligations of OEC to provide Hulse with a free education and stipend and the obligation of Hulse to apply for and diligently participate in the orthodontics program at Jacksonville University (JU) with the ultimate object of obtaining certification in orthodontics. (Doc. 50, Ex. 7 at B, 1.1-1.2, 2.1-2.3).

The Graduate Agreement also contemplates the obligations of OEC and Hulse with respect to setting up a practice for Hulse after graduation. Specifically, OEC promised to set Hulse up with a practice in an area of his choice according to one of two general models attached as exhibits to the Graduate Agreement. Id. at 3.1-3.4.1, Ex. A, B. Hulse agreed to sign a practice agreement which would detail the specifics of the practice "so long as that agreement include[d] terms substantially the same" as those set out in the "Managed Practice Model" or "Practice Acquisition Model." Id. at 3.4.1. The deadline for signing a practice agreement was set at the end of Hulse's first year in the JU program and the Graduate Agreement provides that time was of the essence. Id. at 3.4.1, 7.6.

Because Dr. Hulse selected Phoenix, Arizona as his top choice for work location, OEC elected to use the Managed Practice Model to draft a practice agreement. (Doc. 50, Pl. Depo. Tr. at 65); (Doc. 87 at 12). The Managed Practice Model contains twelve substantive terms and one general term, the latter of which provides for the inclusion of other "usual and customary terms." (Doc. 50, Ex. 7 at Ex. A). The twelve were, in brief: (1)

3

minimum salary $150,000 per year for the first 7 years; (2) Management Company (owned by or affiliated with OEC) to provide capital; (3) profit sharing by the Doctor of 40% in excess of $150,000 for the first 7 years, 50% for the next 5 years and 60% thereafter; (4) termination bonus equal to Doctor's share of the profits for the prior 12 months beginning after year 10 and 150% after year 15; (5) Doctor to work an average of 160 hours per month; (6) Management Company to provide all management services at actual cost plus percent of profits; (7) Management Company to assist in developing and implementing a marketing plan; (8) Management Company not to place any other practice in an area that would adversely affect the profits of the practice; (9) a two year two mile non-competition provision; (10) initial term of 7 years; (11) Doctor to contribute $10,000 to JU for each year in which Doctor earns more than $250,000; and (12) software, procedures and materials to be designated by Management Company. Id. at Ex. A.

In spring of 2004, toward the end of Hulse's first year at JU, four versions of proposed practice agreements were considered by the parties. (Doc. 50, Ex 12, 14, 15, 23). All of the drafts omitted a number of the 12 provisions of the Managed Practice Model. OEC and Hulse agreed at oral argument, and this Court therefore accepts, that only one of these drafts is relevant to the question at issue: whether OEC and Hulse ever reached a practice agreement that Hulse was required to sign. That version, which included an addendum, was entitled, "Equity Owner - Dental Practice Agreement" (Practice Agreement) and was provided by OEC to Hulse on May 17, 2004. (Doc. 50, Ex. 23).

The Practice Agreement sets out the conditions for practice and includes terms relevant to the relationship between the Doctor and the practice to be. Id. at 1(f), 2, 3(a),

4

3(c), 10(f), 12.  To flesh out the relationship between the practice and OEC, the Practice Agreement contemplates the practice entering into a separate "Business Services Agreement" (BSA) with OEC or an OEC affiliate (presumably the "Management Company" referenced in the Managed Practice Model). Id. at C.  The BSA would allow the practice to obtain the benefit of "OEC's expertise, real estate services, facilities construction supervision, marketing, purchasing, operations, training, financial, bookkeeping and technical support, business and accounting systems and intellectual property in the management and operation of the business aspects of the [practice]." Id.  The BSA was to be vital to the agreement between Hulse and OEC because the BSA, the Graduate Agreement, and the Practice Agreement were said to constitute the "entire agreement" between the parties. Id. at 17.  It is undisputed, however, that OEC did not, at any time, provide Hulse with a copy of the BSA.  Indeed, OEC admitted at oral argument that the BSA had not even been drafted in spring 2004, at the end of Hulse's first year at JU, and it did not come into being until March 2005.  The only copies of that document Hulse ever obtained were given to him by his classmates, apparently without the knowledge of OEC. (Doc. 50 Pl. Depo. Tr. at 172-73); (Doc. 50, Ex. 44, 45).

Hulse declined to sign any of the draft practice agreements offered to him by OEC. Thus, the only agreement Hulse ever signed was the original Graduate Agreement.  OEC maintains that the Graduate Agreement required Hulse to sign the Practice Agreement and argues that it is a breach for him to have refused.

**II.     Discussion**

SUMMARY JUDGMENT

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The burden of demonstrating the satisfaction of this standard lies with the movant, who must present pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any that establish the absence of any genuine, material factual dispute." Branche v. AirTran Airways, Inc., 342 F.3d 1248, 1252-53 (11th Cir. 2003) (internal quotation marks omitted). "In making this determination, the court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995).

BREACH OF CONTRACT (GENERAL PRINCIPLES)

"Contract interpretation is a question of law. . . ." Bragg v. Bill Heard Chevrolet, Inc., 374 F.3d 1060, 1065 (11th Cir. 2004) (citing Southland Distrib. Mktg. Co., Inc. v. S&P Co., 296 F.3d 1050, 1053 (11th Cir. 2002)). A provision of a "contract is to be construed in connection with the other provisions, so that if possible, or so far as is possible, they all may harmonize." Heryford v. Davis, 102 U.S. 235, 245 (1880). The Florida Supreme Court has "long held that under contract law principles, contract language that is unambiguous on its face must be given its plain meaning." Green v. Life & Health of Am., 704 So.2d 1386, 1391 (Fla. 1998).[1]  "We acknowledge the rules that if the language is plain and unambiguous,

---

[1] The parties both assume that Florida contract law applies and so does the Court.

there is no occasion for the Court to construe it; that if uncertainty is present, the instrument should be construed against the [drafter]; that the Court should not extend strictness in construction to the point of adding a meaning to language that is clear; and that the Court should construe the contract . . . to give effect to the intent of the parties." Rigel v. National Casualty Co., 76 So.2d 285, 286 (Fla. 1954) (internal citations omitted); see also Hurt v. Leatherby Ins. Co., 380 So.2d 432, 434 (Fla. 1980)("Generally, ambiguities are construed against the drafter of the instrument"). The Court therefore analyzes the contract in this case using the common meaning of language, seeking to avoid internal conflicts between the provisions and construing uncertainties against OEC, the drafter.

HULSE'S REFUSAL TO SIGN THE PRACTICE AGREEMENT

> The rule that it is possible for parties to make an enforceable contract binding them to prepare and execute a subsequent agreement is well recognized. However, "if the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; and the so-called 'contract to make a contract' is not a contract at all."

Moss Inc. v. Cobb Co., Inc., 198 So.2d 872, 874 (Fla. 3d DCA 1967) (quoting Corbin, Contracts § 29 (1963)); see also, W.R. Townsend Contr., Inc. v. Jensen Civ. Constr., Inc., 728 So. 2d 297, 302 (Fla. 1st DCA 1999) (confirming the continuing viability of the rule that parties may make an enforceable contract to prepare and execute a subsequent agreement). Though a contract to contract may be enforceable, a mere "'agreement to agree' is unenforceable as a matter of law." ABC Liquors, Inc. v. Centimark Corp., 967 So. 2d 1053, 1056 (Fla. 5th DCA 2007) (citing Spanish Broad. Sys. of Fla., Inc. v. Alfonso, 689 So. 2d 1092, 1094 (Fla. 3d DCA 1997)). Corbin on Contracts agrees and elaborates, "[e]ven though

certain matters are expressly left to be agreed upon in the future, they may not be regarded by the parties as essential to their present agreement." Corbin, Contracts § 2.8(a) (2010).

Both Hulse and OEC have behaved as though the Graduate Agreement was a binding agreement that would define any later agreement and both have also explicitly admitted as much. (Doc. 86 at 2) ("It is undisputed that the [Graduate] Agreement is the only binding agreement signed by the parties pertinent to this action") (emphasis in original); (Doc. 87 *in passim*). The Graduate Agreement has not only been treated as a binding contract to contract by the parties, it meets the legal standard as well.[2]

Therefore, assuming that the Graduate Agreement was a binding contract that set out the essential terms of a later practice agreement, it follows that the relevant measure of whether the later agreement was a valid fulfillment of the "contract to contract" is whether the later contract contained all those same essential terms. "[W]hat constitutes an essential term of a contract will vary widely according to the nature and complexity of each transaction and must be evaluated on a case specific basis." ABC Liquors, Inc. v. Centimark Corp., 967 So. 2d 1053, 1056 (Fla. 5th DCA 2007) (citing King v. Bray, 867 So. 2d 1224, 1228 (Fla. 5th

---

[2] The Graduate Agreement, together with the Managed Practice Model attached thereto in exhibit A, make an agreement of 12 pages, with around 70 terms, over 20 of which directly (and many more which indirectly) address the responsibilities of Hulse and OEC with regard to the practice to be created. (See Doc. 50, Ex. 7 *in passim*). This detailed contract to contract is in stark contrast to another occasion when this Court considered a purported contract to contract and found merely an unenforceable agreement to agree. CSX Transp., Inc. v. Prof'l Transp., Inc., 467 F. Supp. 2d 1333, 1336, 1338-41 (M.D. Fla. 2006). In CSX, this Court found that a term which simply directed that the parties would negotiate new terms in good faith upon the later happening of a specified condition was an unenforceable agreement to agree. Id. at 1336, 1338-41. Here, however, we have a detailed agreement setting out the later relationship of the parties. Thus, this Court cannot say that the Graduate Agreement fails to set out the essential terms of a later agreement.

DCA 2004)). Here, OEC admitted that the "essential terms and essence" of any later practice agreement are those from the Managed Practice Model appended to the Graduate Agreement.  Furthermore, the Graduate Agreement itself provides the Court with the exact wording by which to judge the enforceability of a subsequent agreement.  The Graduate Agreement states that Hulse would have to sign and thereafter comply with a later practice agreement "so long as that agreement includes terms substantially the same as the 'Practice Agreement Terms' (as defined on[sic] Exhibit A . . .)[.]" (Doc. 50, Ex. 7 at 3.4.1).  In other words, for Hulse to have a legal obligation to sign a practice agreement, the practice agreement had to "include[] terms substantially the same" as those in the Managed Practice Model. Id. at 3.4.1.  OEC has admitted that the Practice Agreement, on its own, does not contain all essential terms of the Managed Practice Model. (Doc. 95 at 3-4).

The Practice Agreement provided by OEC to Hulse includes the terms from the Managed Practice Model which target the doctor directly: the guaranteed salary, the profit sharing, the termination bonus, the work week hours expectation, the non-compete clause, the initial term, and the charitable contribution.[3] (Doc. 50, Ex. 23 at 1(f), 2, 3(a), 3(c), 4(a), 10(f), 12).  The provisions directed at the management of the practice, however, are left to the BSA to describe.

---

[3] While these terms are in the Practice Agreement, they are addressed in a way that seems to favor OEC more than was contemplated in the Managed Practice Model. Moreover, as OEC admits, another material term, the "Protected Area" provision of the Managed Practice Model, which forbade OEC from establishing a competing practice nearby, is missing entirely. (Doc. 50, Ex. 7 at Ex. A) (provision 8); (Doc. 95 at 3-4).

Article C of the Practice Agreement, "Background Facts," provides that the practice would enter into the BSA with OEC "to obtain the benefit, among other things, of OEC's expertise, real estate services, facilities construction supervision, marketing, purchasing, operations, training, financial, book keeping and technical support, business and accounting systems and intellectual property in the management and operation of the business aspects of the [practice]." (Doc. 50, Ex. 23 at C). The definition of "Practice Expenses" in article 3(c) of the Graduate Agreement leaves to the BSA the determination of the amount of fees to be paid by the practice to OEC. Id. at 3(c). The policies and procedures detailing (among other things), "office design, staff compensation, marketing production and media placement, suppliers, office equipment, software, etc." were left also for the parties to determine "[i]n compliance with the terms and conditions of the [BSA]." Id. at 8.

Though Hulse was not intended to be a signatory to it, the BSA was to have legal force against him through the Practice Agreement. One defined "Repayment Event" (breach by the doctor) of the Practice Agreement is if the "Doctor violate[d] or permit[ted] through Doctor's action or inaction, the [practice] to violate the [BSA] . . . ." Id. at 10(b)(xiv). The doctor's right to receive equity distribution upon leaving the practice is conditioned, in part, on whether the doctor "is not in violation of any covenants of the [BSA] . . . ." Id. at 10(f). Finally, if there remains any doubt of its importance, the BSA is said to be part of the "entire agreement between the parties . . . ." Id. at 17.

The Practice Agreement relies heavily on the BSA to provide part of the complete description of the relationship among doctor, practice, and OEC. It also contemplates incorporating the BSA by reference, to embody an agreement of "substantially the same"

terms as those found in the Managed Practice Model. (Doc. 50, Ex. 7 at 3.4.1). However, OEC did not provide Hulse with the BSA at the time he was asked to sign the Practice Agreement or later. OEC has now admitted that the BSA was not even created until 2005, by which time OEC and Hulse were already at odds. Without the BSA to fill in the gaps in the Practice Agreement that OEC admits exist, the Practice Agreement lacks nearly half the essential terms of the Managed Practice Model. (Doc. 95 *in passim*). Under the Graduate Agreement, Hulse was only required to sign "*so long as* [the practice agreement] include[d] terms substantially the same as the 'Practice Agreement Terms' (as defined on[sic] Exhibit A [the Managed Practice Model] . . .). (Doc. 50, Ex. 7 at 3.4.1) (emphasis added). OEC never provided such an agreement to Hulse; therefore, Hulse had no obligation to sign the deficient Practice Agreement and it cannot be a breach of the Graduate Agreement for him to have refused.

## III    Conclusion

It is apparent that Hulse and OEC negotiated back and forth over the terms of a practice agreement. OEC provided several drafts of a practice agreement to Hulse. Had the parties reached a meeting of the minds, they could have entered into a binding practice agreement. However, when the parties could not agree, the only mechanism by which OEC could have <u>required</u> Hulse to enter into a practice agreement would have been to revert back to what had been agreed to in the Graduate Agreement: provide Hulse with a practice agreement that was "substantially the same as" the Managed Practice Model. This OEC failed to do; thus, it is disabled from holding Hulse liable for failing to enter into a practice agreement.

11

Having answered the primary question the parties directed to the Court, the Court will pause. Recognizing that there are other contractual and remedy issues to be resolved and that there also remain other claims, such as alleged misrepresentations and unjust enrichment (based on the undeniable fact that OEC did pay for Hulse's orthodontic education), the Court will direct the parties to try to settle the case before further time and money are spent. No later than January 21, 2011, the parties should advise the Court which mediator they would like to choose or whether the Court should appoint a mediator. If the parties prefer, the Court can designate a Magistrate Judge to conduct a settlement conference.

Accordingly, it is hereby

**ORDERED**:

1. Having addressed the primary legal issue presented by the parties, the Court will defer ruling upon the pending motions at this time.

2. The parties will request that the Court appoint a mediator or provide the Court with their selection of a mediator no later than **January 21, 2011**.

**DONE AND ORDERED** at Jacksonville, Florida this 4th day of January, 2011.

TIMOTHY J. CORRIGAN
United States District Judge

bt.
Copies:
Counsel of Record